UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<u>OPINION AND ORDER</u>

------------------------------------------------------------X

KEVIN MICHAEL BENTLEY, et al.                    :

                **Plaintiffs,**                    :

                                    :

         - against -                    :          11 Civ. 1056 (SAS)

                                    :

ROBERT J. DENNISON, et al.                    :

             **Defendants.**                    :

------------------------------------------------------------X

PAUL BETANCES, et al., individually and on    :
behalf of all others similarly situated

                **Plaintiffs,**                    :

                                    :

         - against -                    :          11 Civ. 3200 (SAS)

                                    :

BRIAN FISCHER, et al.                    :

             **Defendants.**                    :

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/10/12

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       Beginning in 1998, New York mandated that certain violent felonies

be punished by a determinate prison sentence followed by a mandatory term of

parole, known as post-release supervision ("PRS").[1]  The governing statute did not require that the term of PRS be announced by the judge at sentencing.  In thousands of cases where the judge did not impose a term of PRS at sentencing, the New York State Department of Correctional Services ("DOCS") imposed PRS on convicted felons either before or as they were released from prison and the Department of Parole ("DOP") then enforced its terms upon them.

On June 9, 2006, in *Earley v. Murray*, the United States Court of Appeals for the Second Circuit held that the administrative imposition of PRS by DOCS violates the federal constitutional right to Due Process.[2]  The court explained that "[o]nly the judgment of a court, as expressed through the sentence imposed by a judge, has the power to constrain a person's liberty," and that "[t]he additional provision for post-release supervision added by DOCS is a nullity."[3]

Plaintiffs in these two related actions –  the three *Betances* plaintiffs on behalf of themselves and a putative class and the twenty-one *Bentley* plaintiffs – bring their actions pursuant to section 1983 of Title 42 of the United States Code against current and former high-ranking officials at DOCS and DOP.  Plaintiffs

---

[1]      N.Y. Penal Law § 70.45(1).

[2]      *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006).

[3]      *Id.* at 75-76.

2

claim that in the years following *Earley*, "[i]n flat defiance of clear constitutional commands,"[4] state officials subjected them to unlawful custody by continuing to impose the terms of PRS that had been declared unlawful, arresting and re-incarcerating them for technical violations of those terms of PRS, and in one case administratively imposing a new term of PRS.

Defendants now move to dismiss the complaints, principally on the grounds that because plaintiffs' constitutional rights were not "clearly established" at the time that those rights were allegedly violated, state officials are entitled to qualified immunity for their actions. This argument rests principally on the claim that for at least two years following *Earley*, there was confusion in the state courts about whether the decision was binding on the State and what remedies it required.

On close analysis, however, this argument is not persuasive. Although some New York state courts were in disagreement over the reach of the *Earley* decision and although some state trial courts held that they were not bound by a decision of the Second Circuit, there was never any disagreement or confusion about the core constitutional holding announced by *Earley* (and reiterated by the court in a denial for rehearing): terms of PRS imposed by the executive branch were nullified and if the State wished to re-impose them, it could seek resentencing

---

[4]       *Betances* First Amended Complaint ("FAC") ¶ 47.

before a judge.

## II.    BACKGROUND

The following factual allegations are drawn from the plaintiffs'
complaints.  They are not findings of fact, but are assumed to be true for the
purpose of this motion to dismiss and are construed in the light most favorable to
the  plaintiffs.

### A.    The *Betances* Plaintiffs

On July 20, 2004, Paul Betances was sentenced to five years
incarceration.  He was not sentenced to PRS.  On April 24, 2008, DOCS and DOP
administratively-imposed a five-year term of PRS on him. On July 9, 2009 after
Betances had completed his incarceration for robbery and his maximum judicially-
imposed sentence had expired, DOCS and DOP imprisoned him for violating his
administratively-imposed PRS.  He was released after a New York court granted
his writ of habeas corpus on July 24, 2009.[5]

---

[5]      *See Betances* FAC ¶ 13; Decision and Order, Ex. C to Declaration of
Christina Okereke ("Okereke Decl."), Assistant Attorney General, in support of
Defendants' Memorandum of Law in Support of Their Motion to Dismiss the
Amended Complaints in the Above Actions ("Def. Mem."), at 2.  The Court takes
judicial notice of the administrative and state court documents submitted by
defendants that relate to the plaintiffs' custody.  Judicial notice of public records is
appropriate – and does not convert a motion to dismiss into a motion for summary
judgment – because the facts noticed are not subject to reasonable dispute and are
capable of being verified by sources whose accuracy cannot be reasonably
questioned.  *See* Federal Rule of Evidence 201(b); *Ruffins v. Department of Corr.*

On August 15, 2000, Lloyd Barnes was sentenced to six years of incarceration and no term of PRS.  On October 19, 2005, DOCS and DOP administratively-imposed on him a five year term of PRS.  In about June 2008, DOP sentenced Barnes to three months incarceration based on his violation of the terms of his PRS.  Barnes was released around September or October of 2008.[6]

On February 20, 2001, Gabriel Velez was sentenced to five years incarceration.  He was not sentenced to PRS.  On July 2, 2004, he was released from prison and subjected to administratively-imposed PRS.  In July 2008, he was arrested and charged with violating that PRS.  He was incarcerated on that ground until October 6, 2008.  He was released from the terms of the PRS on October 15, 2008 by writ of habeas corpus.[7]  Betances, Barnes, and Velez bring their claims on behalf of a putative class of others who were subjected to administratively-imposed PRS and/or incarcerated for violations of such PRS.[8]

### B.    The *Bentley* Plaintiffs

There are twenty-one plaintiffs in *Bentley* and a recitation of the facts

---

*Servs.*, 701 F. Supp. 2d 385, 390 n.2 (E.D.N.Y. 2010) (collecting cases in which courts have taken judicial notice of similar documents).

[6]      *See Betances* FAC ¶¶ 14, 69.

[7]      *See id.* ¶¶ 72-80.

[8]      *See id.* ¶ 29.

common to all of them is sufficient: each *Bentley* plaintiff alleges that he was

convicted of a crime, sentenced to a determinate term of incarceration, and not

sentenced to any term of PRS.[9]  Each *Bentley* plaintiff was later subjected to

administratively-imposed PRS.  Then, *after* the Second Circuit issued its *Earley*

decision, each *Bentley* plaintiff was incarcerated for technical violations of his

PRS.  With one exception, these incarcerations began on dates after *Earley* and

before April 29, 2008[10] and continued until various dates between February 23,

2008 and November 24, 2008.[11]

       In their complaint, the *Bentley* plaintiffs describe their experiences

during their terms of unlawful custody – both under PRS and during incarceration.

Many of these unlawful terms of PRS lasted for years, as did some of the periods

---

[9]    *Bentley* First Amended Complaint ("FAC") ¶¶ 2, 8-28.

[10]    This is the date on which the New York State Court of Appeals issued two opinions invalidating the administrative imposition of PRS on state law grounds.  *See People v. Sparber*, 10 N.Y.3d 457 (2008) and *Matter of Garner v. New York State Dep't of Corr. Servs.*, 10 N.Y.3d 358 (2008).  Defendants argue that before these decisions, plaintiffs' rights could not have been "clearly established."

[11]    *See Bentley* FAC ¶¶ 2, 8-28.  Plaintiff Hutchinson was incarcerated until January 21, 2009. *See id* ¶ 24.  It is unclear when Hutchinson's final term of incarceration for violation of his PRS began, although it would likely have been after the parole warrant was "lodged against him" on November 20, 2008.  Def. Mem. at 9 n.7.

of unlawful incarceration.[12]  The plaintiffs' alleged experiences include being attacked by corrections officers and placed in solitary confinement,[13] missing the births of their children,[14] and being denied medical care.[15]

### C.    The Defendants

The named defendants are current and former high ranking officials at DOP and DOCS.  They are sued in their individual and official capacities.[16] Plaintiffs allege that defendants were responsible for setting and enforcing the policies at DOP and DOCS that directly caused the deprivation of plaintiffs' constitutional rights. Plaintiffs allege that

> in the immediate aftermath of the Second Circuit's decision in *Earley*, defendants, including defendant [Anthony Annucci, Deputy Commissioner and Counsel for DOCS] undertook an analysis of DOCS records in order to identify all inmates, or former inmates, who were administratively sentenced to PRS by DOCS notwithstanding any indication that a court had actually sentenced that person to PRS, whether in their sentencing and commitment paperwork or the minutes of their sentencing.  That analysis identified 8,100 inmates that could not be subjected to PRS under *Earley*, including 1,600 that had already been released and subjected to PRS.  We know this happened because defendant

---

[12]    *See, e.g.*, *Bentley* FAC ¶¶ 12, 16, 17.

[13]    *See id.* ¶¶  8, 27.

[14]    *See id*. ¶¶ 10, 11.

[15]    *See id.* ¶¶ 9, 27.

[16]    *See Betances* FAC ¶¶ 16-28; *Bentley* FAC ¶¶ 29-32.

Annucci swore to the truth of these facts under penalty of perjury.
. . . Defendants, however, did nothing with the information that
was gathered.[17]

Plaintiffs allege that despite knowing which inmates and parolees

were in custody due to administratively-imposed PRS that had been declared a

"nullity" by *Earley*, defendants continued to arrest people for alleged violations of

the terms of their parole (*e.g.*, failure to report or to adhere to curfew restrictions),

re-incarcerate people after administrative hearings for those violations, impose

PRS on individuals who had not been sentenced to PRS, and fully enforce the

terms of PRS.[18]

Plaintiffs incorporate into their Complaint a letter written by

---

[17]     *Betances* FAC ¶¶ 4-5.  *See also* Affirmation of Anthony J. Annucci
("Annucci Aff."), Ex. A to Declaration of Matthew D. Brinckerhoff, *Betances*
counsel, in support of Plaintiffs' Combined Memorandum of Law in Opposition to
Defendants' Motion to Dismiss ("Pl. Mem."), ¶ 40.  Although the Annucci
Affirmation is not a part of the plaintiffs' Complaints, it was referenced therein and
thus may be considered by the Court.  "In considering a motion to dismiss for
failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the
facts alleged in the complaint, documents attached to the complaint as exhibits, and
documents incorporated by reference in the complaint. . . . Where a document is
not incorporated by reference, the court may nevertheless consider it where the
complaint relies heavily upon its terms and effect, thereby rendering the document
integral to the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111
(2d Cir. 2010) (quotation and citation omitted).

[18]     *See Betances* FAC ¶ 5; *Bentley* FAC ¶¶ 36-39.

8

defendant Annucci to an inmate who had invoked his rights under *Earley*.[19]  In the

letter, Annucci wrote that the 2006 *Earley* decision "is contrary to state appellate

case law" from 2002 through 2005 and that "[w]hen state and federal courts reach

different results regarding state law, the state case law takes precedence over

federal case law in state court until the specific issue is addressed by the US

Supreme Court."[20]  Annucci wrote that "this Department would be required to set

aside your period of post-release supervision if specifically ordered to do so by a

state or federal court . . . . In the absence of such order, your determinate term is

deemed to include a period of post-release supervision pursuant to the statutes and

state case law set forth above."[21]

        This letter, plaintiffs claim, supports their allegation that defendants

"deliberately engaged in a planned campaign of massive resistence to and defiance

of *Earley*."[22]  Plaintiffs allege that the defendants

> were especially aware of *Earley* because numerous persons
> incarcerated for technical violations of administratively-imposed
> PRS after *Earley* filed habeas corpus petitions in the state courts.
> Although defendants prevailed in some of these cases because
> some state trial judges accepted defendants' assertions that they

---

[19]    *Betances* FAC ¶ 6.

[20]    7/2/07 Letter ("Annucci Letter"), Ex. A to *Betances* FAC, at 1-2.

[21]    *Id*. at 2.

[22]    *Bentley* FAC ¶ 36.

9

were not technically "bound" to follow *Earley*, defendants were obviously aware that even if the state courts defied *Earley* as non-binding, the federal district courts – which were bound by *Earley* – would have to grant habeas corpus relief. Regardless of whether the lower state courts or the Appellate Divisions or even the New York State Court of Appeals ultimately disagreed with *Earley*, individuals who had been placed on PRS administratively and sent to prison for PRS violations administratively were entitled to relief in federal court under *Earley*. . . . [23]

## III.   LEGAL STANDARD

### A.   Motion to Dismiss

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court may disregard "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."[24]  In contrast, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[25]

To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[26]  A claim is facially plausible

---

[23]    *Id.* ¶ 40.

[24]    *Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[25]    *Id.* at 1950.  *Accord Den Hollander v. Copacabana Nightclub*, 624 F.3d 30, 32 (2d Cir. 2010).

[26]    *Twombly*, 550 U.S. at 564.

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[27] Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[28] "[A] district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[29]

### B.   Qualified Immunity

Qualified immunity protects officials from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[30]  The Second Circuit has held that "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his or her] conduct

---

[27]     *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

[28]     *Id.* (quotation marks omitted).

[29]     *DiFolco*, 622 F.3d at 111 (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[30]     *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted).

11

was unlawful."[31]

## IV.   DISCUSSION

### A.   There Is No Qualified Immunity for the Affirmative Imposition and Enforcement of Unlawful PRS After *Earley*

#### 1.   Plaintiffs Allege a Violation of Their Constitutional Rights

"It is now indeed clearly established that . . . an administrative imposition of PRS is unconstitutional."[32]  Each plaintiff alleges a constitutional deprivation because he claims that PRS was administratively-imposed on him and then enforced after the *Earley* decision.  Most of the terms of PRS were initially imposed on plaintiffs prior to *Earley*, at a time when the unconstitutional nature of such action had not yet been clearly established.[33]  However, Betances' PRS was allegedly imposed on him by defendants on April 24, 2008, nearly two years after *Earley* had declared such action unconstitutional.[34]  Furthermore, each of the plaintiffs was subjected to PRS after *Earley* and then incarcerated for technical violations of his PRS after *Earley*.  There is little doubt that if these allegations are

---

[31]     *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (quotation omitted).

[32]     *Scott v. Fischer*, 616 F.3d 100, 102 (2d Cir. 2010).

[33]     *See id.* at 107 ("[W]e conclude that it was not clearly established for qualified immunity purposes prior to *Earley* that the administrative imposition of PRS violates the Due Process Clause.").

[34]     *See Betances* FAC ¶ 55.

true, defendants violated plaintiffs' constitutional rights.  The primary question presented by this motion is whether plaintiffs' constitutional rights were clearly established at the time that they were allegedly violated, so that a reasonable senior official at DOCS or DOP would have understood that his or her conduct was unlawful.

## 2.   *Earley* Clearly Established Plaintiffs' Constitutional Rights

Beginning in 1998, New York law mandated that PRS be included as part of violent offenders' determinate sentences.[35]  During that time, New York courts "routinely upheld the administrative imposition of mandatory PRS," even if the sentencing judge had not included it in a defendant's sentence.[36]  On June 9, 2006, the Second Circuit issued its opinion in *Earley*.  The court's ruling was not ambiguous:

> Earley's sentence was therefore never anything other than the six years of incarceration imposed on him by the judge at his sentencing hearing and recorded in his order of commitment.  The additional provision for post-release supervision added by DOCS is a nullity.  The imposition of a sentence is a judicial act; only a judge can do it.  The penalty administratively added by the Department of Corrections was, quite simply, never a part of the sentence.[37]

---

[35]   *See* N.Y. Penal Law § 70.45.

[36]   *Scott*, 616 F.3d at 106.

[37]   *Earley*, 451 F.3d at 76.

13

The *Earley* court also clearly explained the remedy for the legal infirmity – the term of PRS should be vacated and the state given the opportunity to seek appropriate resentencing:

> Because we find that clearly established[38] Supreme Court precedent renders the five-year PRS term added to Earley's sentence by DOCS invalid, we vacate the district court's judgment and remand the case for that court to determine whether Earley's petition for a writ of habeas corpus was timely filed. Should the district court determine that the petition was timely, it is instructed to issue a writ of habeas corpus *excising the term of post-release supervision from Earley's sentence and relieving him of any subsequent penalty or other consequence of its imposition.* Our ruling is not intended to preclude the state from moving in the New York courts to modify Earley's sentence to include the mandatory PRS term.[39]

Defendants argue that "[e]ven after *Earley* was decided, it is clear that the law was unclear as to an appropriate remedy. Even the *Earley* court did not hold that release was a preferred remedy to a constitutional infirmity in sentencing."[40] Defendants' second claim is correct – the *Earley* court did not hold that Earley had to be immediately released. But defendants' first statement is

---

[38]     The *Earley* court was using the term "clearly established" in the context of the Antiterrorism and Effective Death Penalty Act of 1996, where it has a different meaning than it does in the qualified immunity context. *See Scott*, 616 at F.3d 106.

[39]     *Earley*, 451 F.3d at 77 (emphasis added).

[40]     Def. Mem. at 14.

incorrect – the *Earley* court made clear that the appropriate remedy was to remove the unlawful PRS and seek resentencing.  Indeed, defendants at times acknowledge this.  "The clearly established law when plaintiff's PRS was revoked did not require expunging PRS from plaintiff's sentence, or releasing him from prison or parole: *the preferred remedy for such a problem is resentencing*, as expressed by the Second Circuit in *Earley* . . ."[41]  In the absence of such resentencing, plaintiffs were not lawfully subject to the state's custody because, as *Earley* held, "[t]he additional provision for post-release supervision added by DOCS is a nullity."[42]

       After the Second Circuit issued its ruling, the named DOCS superintendent sought rehearing, arguing that *Earley* could have a wide-ranging impact.  The court reiterated its decision and made clear that its holding was not simply limited to Earley's habeas petition, but was meant to impact all improperly imposed sentences:

> Respondent-appellee indicates that New York courts regularly fail to inform defendants of mandatory PRS terms but consider them part of those defendants' sentence nonetheless.  As a result, our decision may call into question the validity of the PRS components of numerous sentences. We nonetheless adhere to our ruling.[43]

---

[41]    *Id.* at 20 (emphasis added).

[42]    *Earley*, 451 F.3d at 76.

[43]    *Earley v. Murray*, 462 F.3d 147, 150 (2d Cir. 2006).

In *Scott v. Fischer*, the Second Circuit authoritatively established that government officials have qualified immunity for their imposition and enforcement of PRS prior to *Earley*, because until that time it was not clearly established, for qualified immunity purposes, that administratively-imposed PRS was unconstitutional.[44]  But the court explicitly refrained from determining when the right to be free from administratively-imposed PRS *did* become clearly established.[45]  Instead, it dismissed Scott's section 1983 claims regarding her post-*Earley* arrest, parole revocation, and incarceration on grounds that clearly distinguish the *Scott* complaint from these plaintiffs' complaints.

*First*, the Second Circuit held that DOC officials could not be sued by Scott for the revocation of her PRS (which happened after *Earley*) because the parole violation hearing "was conducted entirely by and before the New York State Division of Parole" and there were no facts pled that "could establish that the DOC

---

[44]     *See Scott*, 616 F.3d at 107.  Choice Scott, the plaintiff, had been arrested for violating her administratively-imposed PRS in October 2006 on a warrant that had been issued in March 2004.  A parole revocation hearing was held on January 16, 2007 and Scott was sentenced to eighteen months of imprisonment for the violation.  Her habeas corpus petition was granted by a state court on August 7, 2007.  *See id.* at 103.

[45]     *See id.* at 108.

defendants were aware of, let alone participated in, the hearing."[46]  Unlike the plaintiff in *Scott*, the plaintiffs here have sued the DOP officials who set and supervised PRS revocation policy during the time that plaintiffs' PRS was revoked.[47]

      *Second*, the Second Circuit held that Scott's complaint did not assert "that the DOC defendants themselves knew whether her PRS had been imposed administratively or judicially."[48]  In contrast, the plaintiffs here have alleged (and submitted proof) that "Defendant Annucci has also stated under oath that early in 2007 DOCS began to identify the inmates in its custody to whom *Earley* was applicable, and by the spring of 2007 had in fact identified most of them."[49]  Thus, in contrast to the plaintiff in *Scott*, the *Betances* and *Bentley* plaintiffs have clearly and plausibly alleged that DOC defendants knew that the plaintiffs' terms of PRS had been imposed administratively when those plaintiffs were returned to DOC custody for unlawful incarceration, and that the DOC officials were deliberately indifferent to these known violations of the plaintiffs' rights.

---

[46]    *Id.* at 110.

[47]    This difference also alleviates the standing concerns raised by the Second Circuit.  *See id.* at 111.

[48]    *Id.*

[49]    *Bentley* FAC ¶ 53 (citing *State v. Myers*, No. 4934-08, Affirmation of June 4, 2008 (Sup. Ct. Albany Co.)).  *See also* Annucci Aff. ¶ 40.

17

Defendants argue that "no federal court, either at the trial or the appellate level, has found that [prior to the enactment of remedial legislation in July 2008] the State or any of its officials had an affirmative *duty* – either under the Constitution or under State procedural law – to remediate flawed PRS by taking action to verify the sentence calculations of inmates or parolees."[50]  The Second Circuit accepted this argument in *Scott*.[51]  Therefore, if plaintiffs' only complaint were that defendants had failed to evaluate the legitimacy of their terms of PRS or to seek resentencing, dismissal on the basis of qualified immunity might be appropriate.  But plaintiffs allege that post-*Earley*, DOC *voluntarily* identified more than eight thousand defendants on whom a term of PRS had been improperly imposed.  Despite that knowledge: DOP revoked each of plaintiffs' PRS on the basis of technical violations; DOC incarcerated plaintiffs whom it knew had been given PRS by the executive branch, not a judge; and DOC even imposed a new term of PRS on plaintiff Betances in April, 2008, nearly two years after *Earley*.[52]  These claims allege that defendants affirmatively acted to violate plaintiffs' rights, not merely that they failed to "remediate flawed PRS by taking action to verify the

---

[50]     Def. Mem. at 3 (emphasis added).

[51]     *See Scott*, 616 F.3d at 109.

[52]     *See Betances* FAC ¶ 55, Pl. Mem. at 24-25.

18

sentence calculations of inmates and parolees."[53]

Faced with a section 1983 claim from a plaintiff who had been arrested and re-incarcerated after *Earley* for violating administratively-imposed PRS, Judge John Gleeson of the Eastern District of New York noted that "after *Earley*, the defendants could have reasonably believed that the remedy for the concededly unlawful administrative imposition of a supervision term was a resentencing procedure in which a judge imposed the correct sentence, *effective as of the date of the original sentence*."[54]  I agree.  If defendants wanted to continue imposing supervision on the plaintiffs, they could have sought resentencing by a judge and therefore satisfied the Due Process requirements laid out in *Earley*.  But the *Betances* and *Bentley* plaintiffs allege that defendants did not seek such resentencing for nearly two years.  Instead, on the basis of violations of a PRS that the Second Circuit had already declared null and void, DOP revoked plaintiffs' supervision and DOCS re-incarcerated them.  Judge Gleeson also held that "[n]othing in *Earley* or *Sparber* suggested that administratively-imposed terms of

---

[53]     Def. Mem. at 3.

[54]     *Joyner-El-Quwi-Bey v. Russi*, No. 09 Civ. 2047, 2010 WL 1222804, at *3 (E.D.N.Y. Mar. 23, 2010) (emphasis in the original), *aff'd*, 2010 WL 4091017 (2d Cir. Sept. 15, 2011).

supervision should be administratively revoked or otherwise unenforced."[55]  Here I am constrained to disagree.  The *Earley* court clearly revoked all administratively-imposed terms of PRS ("[t]he penalty administratively added by the Department of Corrections was, quite simply, never a part of the sentence") but permitted the State to seek a reimposition of those terms by a judge.[56]  *Earley* cannot be read to permit defendants to arrest and re-incarcerate plaintiffs without seeking such a resentencing.

Plaintiffs allege that, well aware of *Earley* and the thousands of people covered by *Earley*'s holding, defendants continued to revoke PRS and re-incarcerate people for violations of their PRS terms, without seeking resentencing by a judge.  "'[A] supervisory official may be liable under section 1983 not only because he or she created a policy or custom under which unconstitutional practices occurred, but also because he or she *allowed such a policy or custom to continue*.'"[57]  As a result, if the allegations regarding their actions after *Earley* are correct, defendants are not entitled to qualified immunity for re-incarcerating plaintiffs based on terms of PRS that had already been nullified or for the

---

[55]    *Id*.

[56]    *Earley*, 451 F.3d at 76.

[57]    *Scott*, 616 F.3d at 109 (quoting *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986)) (emphasis added).

administrative imposition of new PRS.

### 3.   The *Earley* District Court's Actions on Remand Did Not Create Any Confusion About the Appropriate Remedy

By the time *Earley* was remanded from the Second Circuit and Judge Edward Korman determined that Earley's petition for habeas corpus had been timely filed, Earley was again incarcerated, this time for a violation of his PRS. Judge Korman granted Earley the writ but stayed his order for twenty-eight days "to permit the sentencing court to exercise its power to conform the sentence to the mandate of New York law."[58]  Earley's attorney filed a motion for reconsideration, arguing that "[s]ince petitioner's PRS has been unequivocally invalidated, it does not exist, and in fact never existed. Petitioner remains incarcerated for violation of a term he did not receive."[59]  The court rejected this argument, and granted a new stay of the writ pending appeal of the Second Circuit's decision to the Supreme Court.[60]

Defendants point to Judge Korman's actions for the proposition that

---

[58]   *Earley v. Murray*, No. 03 Civ. 3104, 2007 WL 1288031, at *3 (E.D.N.Y. May 1, 2007).

[59]   Memorandum of Law in Support of Petitioner's Rule 59 Motion, *Earley v. Murray*, No. 03 Civ. 3104, at 9 [Docket No. 48].

[60]   *See* Memorandum and Order, *Earley v. Murray*, No. 03 Civ. 3104, at 4 (E.D.N.Y. May 16, 2007) [Docket No. 51].

[e]ven after *Earley* was decided, it is clear that the law was unclear as to an appropriate remedy.  Even the *Earley* court did not hold that release was a preferred remedy to a constitutional infirmity in sentencing.  Judge Kormann [sic], in May 2007, stayed his grant of the federal writ of habeas corpus to afford the People the opportunity to resentence petitioner Earley, *nunc pro tunc*.[61]

This argument is a straw man.  Plaintiffs are not claiming that defendants were obligated immediately to release people from prison.  But, barring that remedy, they were obligated to seek resentencing.  Judge Korman stayed his writ for twenty-eight days so that the People could immediately move for resentencing.  But with respect to the *Betances* and *Bentley* plaintiffs, defendants did not seek resentencing until *twenty-three months* after *Earley*.[62]  Instead, they continued imposing PRS on plaintiffs, arrested them, and re-incarcerated them.  Judge Korman's actions followed the Circuit's directives and did not create

---

[61]     Def. Mem. at 13-14.

[62]     In May 2008, "the State of New York filed a declaratory judgment defense class action against individuals with flawed PRS in which they sought direction from the State courts as to the rights and duties of the parties, and specifically requested that the Supreme Court . . . order timely and efficient resentencings."  *Id.* at 8.  This action satisfied *Earley*'s clear command to seek resentencing, but by then thousands of individuals had been under unlawful custody for nearly two years.  Had the state court granted the mass resentencing request, defendants would have been free of any liability for custody occurring after the resentencing.  But "the Albany Supreme Court declined to grant the relief sought." *Id*.  As a result, some plaintiffs remained under unlawful custody, never having been resentenced by a judge.

22

confusion about the state of the clearly established law or the appropriate remedy.

It is important to emphasize why the remedy of resentencing was so important to plaintiffs, and not merely an exercise in constitutional formalities that would have had no real impact on them: according to an attorney who led the Legal Aid Society's post-*Earley* efforts, once affected individuals eventually were resentenced by judges in 2008 and 2009

> the overwhelming majority of [them] were released from prison and from PRS custody by sentencing judges.  Many had already completed their sentences, or at least had been on PRS long enough to have served the minimum PRS term that the judge could have imposed at sentencing.  (DOCS had imposed the maximum PRS term in every instance, even though the sentencing judges could and often did impose shorter PRS terms.)[63]

### 4.    Subsequent State Court Decisions Could Not and Did Not Place *Earley*'s Holding in Doubt

Central to defendants' argument that they did not violate "clearly established" constitutional rights is their claim that in the two years after *Earley*, there was confusion in the lower state courts and "the law in the federal and state courts continued to evolve."[64]  The Second Circuit reiterated this argument in dicta in *Scott v. Fischer*, noting that

---

[63]    Declaration of Alon Harpaz, lead attorney at the Legal Aid Society's Parole Revocation Defense Unit, ("Harpaz Decl."), Ex. B to *Betances* FAC, ¶ 10. This declaration was incorporated into the *Betances* Complaint.

[64]    Def. Mem. at 7.

Whether *Earley* itself sufficed clearly to establish the unconstitutionality of administratively imposed PRS for a reasonable New York State correctional official *may be* open to question inasmuch as two Departments of the New York Appellate Division thereafter continued to find the practice constitutional, conclusions that appear to reflect oversight rather than defiance of *Earley*. *See Garner v. N.Y. State Dep't of Corr. Servs.*, 831 N.Y.S.2d 923 (3d Dep't 2007); *People v. Thomas*, 826 N.Y.S.2d 36 (1st Dep't 2006). It was not until 2008 that the New York Court of Appeals held that administrative imposition of PRS by DOC was contrary to law. *See Garner v. N.Y. State Dep't of Corr. Servs.*, 10 N.Y.3d 358 (2008); *People v. Sparber*, 10 N.Y.3d 457 (2008). In circumstances of such apparent judicial confusion as to the constitutional propriety of a statutory mandate, qualified immunity might well continue to shield state officials acting pursuant to that statute.[65]

This reading of the caselaw has been reiterated by many district courts

adjudicating section 1983 claims regarding unlawful arrests and re-incarcerations

between *Earley* and the April 29, 2008 New York Court of Appeals decisions in

*Sparber* and *Garner*.[66] And as Judge Kenneth Karas has explained, "the

_____

[65]      *Scott*, 616 F.3d at 107-08 (emphasis added).

[66]      *See, e.g.*, *Robinson v. Fischer*, No. 09 Civ. 8882, 2010 WL 5376204, at *8 (S.D.N.Y. Dec. 29, 2010) (collecting the many cases in which qualified immunity has been granted and explaining that this was done in large part "in light of post-*Earley* New York Appellate Division decisions that continued to find the administrative imposition of PRS constitutional, *see, e.g.*, *Garner* . . . [and] *Thomas*. . . ."). *Accord Hardy v. Fischer*, No. 08 Civ. 2460, 2010 WL 4359229, at *3 (S.D.N.Y. Nov. 3, 2010) (citing to *Garner* and *Thomas* for the proposition that "[t]wo of New York's Appellate Divisions continued to uphold the lawfulness of administratively imposed PRS."); *Williams v. Fischer*, No. 08 Civ. 4612, 2010 WL 3924688, at *5 (E.D.N.Y. Sept. 30, 2010) ("In light of the 'judicial confusion' to which the Second Circuit alluded in *Scott*, this court holds that during the period

24

overwhelming consensus within the Second Circuit is that the protection of qualified immunity applied until April 2008, when the New York Court of Appeals resolved a split among the lower courts and invalidated the administrative imposition of PRS."[67]  Defendants' argument that there was confusion in the lower courts, and that therefore *Earley*'s holding was not clearly established, has been the linchpin of their continued success in obtaining qualified immunity.  And indeed it is true that "[i]f judges . . .  disagree on a constitutional question, it is unfair to subject [government officials] to money damages for picking the losing side of a controversy."[68]  But it is incorrect to say that the Appellate Division found administrative PRS constitutional.  Defendants point to no court that has ever questioned – let alone disagreed with – the holding in *Earley*.  Indeed, the notion of confusion rests on a misreading of the relevant Appellate Division cases.

　　　　Defendants point to five Appellate Division cases from 2006 and 2007

---

between *Earley* and the *Sparber/Garner* decisions, it was not clearly established that administrative imposition of PRS is unconstitutional.").

[67]　　*Locantore v. Hunt*, 775 F. Supp. 2d 680, 687 (S.D.N.Y. 2011). *Accord Baker v. City of New York*, No. 09 Civ. 10604, 2010 WL 4273269, at *5 (S.D.N.Y. Oct. 29, 2010) ("at the time of Plaintiff Baker's arrest in 2007, there was still no clearly established rule against the administrative imposition of PRS by DOCS"); *Ruffins*, 701 F. Supp. 2d at 408 (between *Earley* and *Garner/Sparber* "it was not clearly established that DOCS could not enforce the terms of Ruffins's PRS").

[68]　　*Wilson v. Layne*, 526 U.S. 603, 618 (1999).

to support the notion of confusion following *Earley*.[69]  But the first four of these –
*Lingle*, *Sparber*, *Thomas*, and *Boyer* – did not deal with administratively-imposed
PRS at all.  Instead, the PRS imposed on the defendants in these cases had been
written in the sentencing courts' sentence and commitment orders.[70]  The appellate
courts in these cases determined that these impositions of PRS had complied with
*Earley*'s requirements because they had been imposed *by the courts*, not by DOCS,
even though they had not been verbalized by the sentencing judge.  These four
cases, therefore, are evidence that the lower courts were still trying to determine
how far they should extend *Earley*'s logic.  The cases do not show that the
appellate courts were in disagreement over whether *Earley* had invalidated PRS
*imposed by DOCS*.[71]  The fifth case cited by defendants – *Garner* – was a two-

---

[69]     *See People v. Lingle*, 825 N.Y.S.2d 12 (1st Dep't 2006); *People v.
Sparber*, 823 N.Y.S.2d 405, 406 (1st Dep't 2006); *People v. Thomas*, 826
N.Y.S.2d 36 (1st Dep't 2006); *People v. Boyer*, 827 N.Y.S.2d 776 (3d Dep't
2007); *Garner v. Department of Corr. Servs.*, 831 N.Y.S.2d 923 (3d Dep't 2007).

[70]     *See Thomas*, 826 N.Y.S.2d at 38.

[71]     This uncertainty regarding the reach of *Earley*'s dicta might well
merit qualified immunity against claims brought by individuals whose sentencing
and commitment sheets included a term of PRS but whose sentencing minutes did
not.  However, none of the *Betances* or *Bentley* plaintiffs fit into this category.
Instead, all of their terms of PRS were imposed by DOCS.  This distinction was
not lost on DOCS.  Beginning in early 2007, it specifically reviewed inmate files to
determine whether their sentence and commitment orders had or had not imposed
PRS.  *See* Annucci Aff. ¶¶ 39-43.

paragraph ruling that did not mention *Earley* or the constitutionality of administratively-imposed PRS at all but rather dismissed the request for relief on state procedural grounds.[72]   Therefore, neither of the two cases cited by the Second Circuit and many district courts (*Garner* and *Thomas*) actually stand for the proposition that "the New York Appellate Division thereafter continued to find the practice [of administratively imposing PRS] constitutional."[73]

In a thorough opinion that helpfully lays out the procedural history following *Earley*, Judge Joseph Bianco of the Eastern District of New York points to "several New York state court opinions during this time period that demonstrate that the New York courts were in severe disagreement as to *Earley*'s application."[74]   And indeed it is true that there was uncertainty regarding the outer reaches of *Earley*.   But none of the cases cited by defendants show that there was confusion regarding the clear, core constitutional holding in *Earley*: that

---

[72]   *See Garner*, 831 N.Y.S.2d 923 (holding that the remedy of "prohibition" was unavailable under Article 78 because DOCS had not performed any judicial function by enforcing the terms of PRS and "prohibition" is unavailable except when administrative agencies are functioning in a judicial or quasi-judicial capacity), *rev'd*, 10 N.Y.3d 358 (2008).

[73]   *Scott*, 616 F.3d at 107.

[74]   *Ruffins*, 701 F. Supp. 2d at 405 (emphasis added).   One point of uncertainty dealt with whether New York statutory law permitted resentencing years after a conviction.   *See, e.g.*, *People v. Keile*, No. 9917-98, 2006 WL 2569964, at *2 (Sup. Ct. N.Y. Co. Sept. 5, 2006).

administratively-imposed PRS was unlawful and that if the state wished to enforce

such PRS, resentencing by a judge was required.

It is true that some trial level state courts initially held that *Earley* was

not binding on them and did not require that they invalidate administrative PRS.[75]

It is also noteworthy that immediately after *Earley* was issued, other state courts

were already fully accepting its authority and referring defendants back to court for

resentencing or removing terms of unlawfully-imposed PRS.[76]  Defendants do not

cite to any post-*Earley* trial court opinions that in any way "unestablished" the

clear constitutional holding in *Earley*.  But their "confusion" argument rests on this

logic.  There are two problems with the position.  *First*, it was DOCS and DOP that

immediately began urging the lower courts not to follow *Earley*: As one trial court

explained, "[t]he people . . . now oppose defendant's application, contending that

the Second Circuit case of *Earley v Murray*, cited by defendant, is not binding on

---

[75]     *See, e.g.*, *Quinones v. State of New York Department of Corr. Servs.*,
824 N.Y.S.2d 877, 881 (Sup. Ct. Albany Co. Nov. 16, 2006), *rev'd*,  848 N.Y.S.2d
757 (3d Dep't 2007) (holding, on *Earley*'s authority, that only a judge can impose
a sentence of any kind, including PRS).

[76]     *See, e.g.*, *People v. Cephus*, No. 7337/01, 2006 WL 2714448, at *3
(Sup. Ct. Kings Co. June 28, 2006); *People v. Ryan*, 822 N.Y.S.2d 856 (Sup. Ct.
Queens Co. July 28, 2006).

this court."[77]  This argument was repeated by defendant Annucci in his letter to an

inmate seeking to invoke his rights.[78]  Annucci wrote this letter because

"[Defendant] Commissioner Fischer has asked me to."[79]  *Second*, even if the lower

state courts determined that *they* were not bound by *Earley*, it would not have

justified defiance of *Earley* by the defendants, who indisputably *were* bound by

it.[80]  The Supremacy Clause precludes state officials taking actions that violate the

federal Constitution, even if those actions are authorized or mandated by state law.

The Second Circuit recognized that its decision "may call into question the validity

---

[77]     *Ryan*, 822 N.Y.S.2d at 857.  Describing the State's response in more than one hundred habeas corpus actions filed by his office at the Legal Aid Society in the wake of *Earley*, Harpaz declares that: "The initial response from the AG on behalf of DOCS and the Division did not cite a single appellate precedent that purportedly disagreed with *Earley*.  Instead, the response merely stated that *Earley* was not binding on the New York courts, and did not even attempt to argue that *Earley* was wrong on the merits.  DOCS and the Division of Parole did not claim that they were trapped between competing precedents and thereby believed in good faith that they were obligated to oppose *Earley*.  Rather, the policy making administrators of these agencies made a calculated decision – one not based on the law – to continue to impose and enforce administrative PRS come what may." Harpaz Decl. ¶ 10.

[78]     *See* Annucci Letter at 2 ("When state and federal courts reach different results regarding state law, the state case law takes precedence over federal case law in state court until the specific issue is addressed by the US Supreme Court.").

[79]     *Id*. at 1.

[80]     *See Cooper v. Aaron*, 358 U.S. 1 (1958).

of the PRS components of numerous sentences."[81]

Defendants Annucci and Terrence Tracy, chief counsel to DOP, are experienced attorneys.  The other defendants are (or were) high ranking officials with access to skilled legal counsel and the responsibility to ensure that their large agencies complied with all state and federal laws.  None of the defendants were low ranking police officers making quick decisions on the street under high pressure.  By contrast, these defendants had ample time to consider their response to *Earley*.  Any reasonable high-ranking New York official would know that she is bound by decisions of the Second Circuit and that the United States Constitution trumps any conflicting state laws.  In light of *Earley*'s holding, it was improper of DOCS and DOP to wait until they were "specifically ordered to [set aside each individual PRS] by a state or federal court."[82]  Defendants had an obligation to treat *Earley* as binding on all terms of administratively-imposed PRS.

Any alleged confusion indisputably was resolved on April 29, 2008, when the New York Court of Appeals issued its decisions in *Garner* and *Sparber*.  *Sparber* held that as a matter of state law, all sentences of PRS must be pronounced

---

[81]     *Earley*, 462 F.3d at 150.

[82]     Annucci Letter at 2.

by the judge at sentencing.[83]  *Garner* reversed the lower court and held that

because the imposition of PRS is a judicial act, an Article 78 proceeding is an

appropriate procedural route by which to challenge a term of administratively-

imposed PRS.[84]  This was the only holding made by the *Garner* court.  A number

of courts have either held or suggested that this date marks the point at which

*Earley*'s constitutional holding became clearly established.[85]  However, in both

*Sparber* and *Garner*, the Court of Appeals explicitly refused to address any

constitutional concerns or pass on the applicability or consequences of *Earley*.[86]  It

is therefore difficult to see how the New York Court of Appeals, as opposed to the

Second Circuit in *Earley*, could have clearly established plaintiffs' federal

constitutional rights.  Furthermore, as plaintiffs note, only the United States Courts

---

[83]     *Sparber*, 10 N.Y.3d at 470.

[84]     *Garner*, 10 N.Y.3d at 361.

[85]     *See Williams*, 2010 WL 3924688, at *6.  *See also Ruffins*, 701 F.
Supp. 2d at 408 (requesting further briefing in order to determine whether April 29,
2008 is the appropriate date).  Defendants argue that qualified immunity should
extend through June 2008, when remedial state legislation went into effect. *See*
Def. Mem. at 13.  But this argument suffers from the same fundamental flaws as
the *Sparber*/*Garner* date.

[86]     "Having resolved this issue on statutory grounds, we need not reach
petitioner's constitutional arguments and decline to do so . . . Neither do we pass
on the applicability of *Earley v. Murray*," *Garner*, 10 N.Y.3d at 363; "Because
defendants are entitled to relief under the [Criminal Procedure Law], we need not
reach their constitutional claims, which rely primarily upon the Second Circuit's
decision in *Earley*." *Sparber*, 10 N.Y.3d at 471 n.5.

31

of Appeals and the United States Supreme Court can "clearly establish"

constitutional law for the purpose of qualified immunity.  Because the *Scott* court

held that the constitutional law was "now indeed clearly established," it seems

unlikely that any case other than *Earley* could have done the establishing.[87]

In short, defendants have pointed to no state cases that questioned the

constitutional holding or clearly articulated remedies in *Earley*.  Nor could they.

State courts do not have the power to invalidate the interpretations of the federal

Constitution handed down by a federal Court of Appeals.  And *Earley*'s holding

was crystal clear: "The additional provision for post-release supervision added by

DOCS is a nullity."[88]  As plaintiffs correctly argue,

> [e]ven if the state courts had disagreed as a matter of federal
> constitutional law (they did not), that would be of no moment.  To
> allow the decisions of New York state courts to effectively nullify
> [an] individual's clearly established federal constitutional rights
> as determined by the Second Circuit would violate the Supremacy

---

[87]    *Scott*, 616 F.3d at 102.  The *Scott* court did not clearly establish the law, since the court refused to decide "precisely when it *became* clearly established."  *Id.* at 108 (emphasis added).

[88]    *Earley*, 451 F.3d at 76.  It is on the basis of *Earley*'s clarity that I cannot join my colleagues in holding that "at the time of Plaintiff Baker's arrest in 2007, there was still no clearly established rule against the administrative imposition of PRS by DOCS," *Baker*, 2010 WL 4273269, at *5, or that between *Earley* and *Garner/Sparber* "it was not clearly established that DOCS could not enforce the terms of Ruffins's PRS." *Ruffins*, 701 F. Supp. 2d at 408.

Clause and undermine our federalist system.[89]

I recognize that on this point, I am in disagreement with many of my colleagues.  But this disagreement arises from a fundamental misunderstanding.  The intermediate state courts' approval of PRS imposed by judges via sentencing documents never placed in doubt *Earley*'s central holding that nullified the terms of PRS imposed by the executive branch.  Defendants should not be permitted to sow greater confusion regarding the history of these post-*Earley* cases in order to obtain immunity for their allegedly unconstitutional acts.  My conclusion is also different from that of my colleagues because the *Bentley* and *Betances* Complaints, unlike complaints in other cases, make the following plausible allegations, supported by documents that are incorporated in the Complaints or are found in the public record: (1) defendants *knew* who was under administratively-imposed PRS by early 2007; (2) defendants intentionally sought to evade *Earley* by urging state courts not to follow it; (3) defendants knew they would be bound by court orders to comply with *Earley* on a case-by-case basis, but refused to apply its holding broadly without such orders; and (4) defendants continued administratively imposing PRS through at least April 2008, revoking such PRS on the basis of violations through at least February 2009, and imprisoning people based on those

---

[89]     Pl. Mem. at 20.

violations through at least July 2009.

     **5.**    **Plaintiffs Allege that Beginning in July 2008, Defendants Failed to Comply with Their Affirmative Legal Duties**

The Second Circuit has explained that when the New York State Legislature passed Correction Law § 601(d), it "imposed an affirmative duty on the part of [government officials]" to seek to resentence or otherwise handle the cases of inmates" such as plaintiffs, a duty that was effective June 30, 2008.[90]  Plaintiffs allege that "[d]espite this crystal clarity of the law, *none* of the *Betances* Plaintiffs here were ever resentenced, and were only released after months of incarceration post-June 2008 upon their own habeas petitions, or after completing their full sentences."[91]  On November 15, 2008, DOP issued a parole violation warrant charging Betances with having violated his administratively-imposed PRS; on February 23, 2009, that PRS was revoked at a parole hearing; and for an uncertain number of days in July 2009, Betances was imprisoned solely for those technical violations.[92]  On July 8, 2008, DOP issued a warrant charging Velez with

---

[90]    *Scott*, 616 F.3d at 109.

[91]    Pl. Mem. at 26.

[92]    *See id.* at 10; Defendants' Reply Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaints at 6; Decision and Order, Ex. C to Okereke Decl. at 1.

violations of his administratively-imposed PRS.[93]  He was arrested and
incarcerated for approximately three months, when he was released as a result of a
grant of habeas corpus.[94]  In June 2008, DOP sentenced Barnes to three months
incarceration based on violations of the terms of his administratively-imposed
PRS.  Barnes was released in or around September or October of 2008.[95]

The *Bentley* plaintiffs were released from unlawful incarceration at
various times between February 25, 2008[96] and January 21, 2009.[97]  Some of these
plaintiffs were released after DOCS requested that a state judge resentence them in
accordance with Section 601(d),[98] some on their own petitions for habeas corpus,[99]
and some because they had served their entire sentences.[100]  Plaintiffs'
incarcerations continued for various lengths of time until thirteen months *after* the
New York Legislature established a process for plaintiffs' resentencing, sixteen

---

[93]    Decision and Order, Ex. F to Okereke Decl., at 2.

[94]    *See Betances* FAC ¶ 77-79.

[95]    *See id.* ¶ 14.

[96]    *Bentley* FAC ¶ 27(c).

[97]    *Id.* ¶ 24.

[98]    *See, e.g., id.* ¶ 13.

[99]    *See, e.g., id.* ¶ 14.

[100]   *See, e.g., id.* ¶ 17.

months after the New York Court of Appeals ruled in *Sparber* and *Garber*, and more than three years after the Second Circuit had first declared plaintiffs' terms of PRS "a nullity."  Whether or not defendants complied with their affirmative duties after June 2008 is a separate question of fact, but there is no dispute that they had clear affirmative duties during that time period.  If a factfinder determines that they failed to comply with those obligations, they will not be protected by qualified immunity.

### B.   Defendants' Other Arguments Do Not Merit Dismissal

#### 1.   Plaintiffs Have Made Plausible Factual Allegations that Defendants Were Individually Responsible for the Deprivation of Plaintiffs' Constitutional Rights

Defendants argue that plaintiffs have failed to plead defendants' personal involvement.  To state a constitutional tort claim, "a [p]laintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[101]  Certainly, even after *Iqbal*, a supervisor may be liable for constitutional torts not only if she commits the tort herself, but if she "created a policy or custom under which unconstitutional practices occurred."[102]  Indeed, in *Scott*, which was decided more than a year after *Iqbal*, the

---

[101]   *Iqbal*, 129 S. Ct. at 1948.

[102]   *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted). *Colon* described five categories of actions that might expose a supervisor to

Second Circuit explained that "a supervisory official may be liable under section 1983 not only because he or she created a policy or custom under which unconstitutional practices occurred, *but also because he or she allowed such a policy or custom to continue*.'"[103]

Regardless of precisely how the Second Circuit decides to apply *Iqbal*, plaintiffs have pled sufficiently detailed and plausible facts to support their allegation that in the period after *Earley*, each of the defendants personally created and/or implemented the policies and practices that led to the deprivations of plaintiffs' constitutional rights.[104]   According to plaintiffs' allegations, defendants were the officials individually responsible for establishing and enforcing DOCS's and DOP's policies with respect to PRS – policies that led directly to plaintiffs' unlawful custody.   These claims allege sufficient personal involvement to survive a

---

liability for constitutional torts.   Plaintiffs' claims fall under the third *Colon* category, which establishes liability for supervisors who "created a policy or custom under which unconstitutional practices occurred." *Id.*   Although the Second Circuit has not yet addressed the issue, district courts agree that category three has survived *Iqbal.   See Delgado v. Bezio*, No. 09 Civ. 6899, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011); *Qasem v. Toro*, 737 F. Supp. 2d 147, 152 (S.D.N.Y 2010); *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801, 2009 WL 1835939, at *4 (S.D.N.Y. June 26, 2009). Dismissal for failure to plead personal involvement is thus inappropriate.

[103]      *Scott*, 616 F.3d at 100 (quoting *Williams*, 781 F.2d at 323) (emphasis added).   *Scott* did not cite or discuss *Iqbal*.

[104]      *See Betances* FAC ¶¶ 16-26; *Bentley* FAC ¶¶ 29-32.

motion to dismiss.

### 2. Plaintiffs' Claims Are Not Barred By the Eleventh Amendment

Defendants argue that New York's sovereign immunity, embodied in the Eleventh Amendment, bars plaintiffs' claims because "[t]he State of New York and its officials sued in their official capacity are immune from suits for money damages in federal court."[105]  Defendants have been sued in both their individual and official capacities.[106]  Plaintiffs seek both money damages and declaratory relief.[107]  The Eleventh Amendment does not bar suits for money damages against state officials sued in their individual capacity, "even when the conduct complained of was carried out in accordance with state law."[108]  Nor does it bar claims for equitable relief.[109]

### 3. Plaintiffs' Claims Are Not Barred By the Statute of Limitations or for Late Service

Defendants argue that plaintiffs' claims may be barred by the three

---

[105]   Def. Mem. at 27.

[106]   *Betances* FAC at 1; *Bentley* FAC at 1.

[107]   *Betances* FAC at 19; *Bentley* FAC at 29.

[108]   *Ford v. Reynolds*, 316 F.3d 351, 356 (2d Cir. 2003).

[109]   *See Fulton v. Goord*, 591 F.3d 37, 45 (2d Cir. 2009).

year statute of limitations for section 1983 actions in New York.[110]  However, "a §

1983 cause of action for damages attributable to an unconstitutional conviction or

sentence does not accrue until the conviction or sentence has been invalidated."[111]

Courts dealing with post-*Earley* section 1983 claims have all held that pursuant to

*Heck v. Humphrey*, plaintiffs' cause of action accrues only once the underlying

sentence is invalidated or the writ of habeas corpus granted.[112]  All *Betances*

plaintiffs were released from custody less than three years before their suit was

filed on May 11, 2011.  All *Bentley* plaintiffs were released from custody less than

three years before their suit was filed on February 10, 2011.

      Defendants also argue that the *Betances* Amended Complaint should

be dismissed because it was served on October 24, 2011, more than 120 days after

the original complaint was filed and four days after the extended deadline for filing

set by the court at a status conference.[113]  The Amended Complaint was filed

---

[110]    *See* Def. Mem. at 22.

[111]    *Heck v. Humphrey*, 512 U.S. 477, 489-90 (1994).

[112]    *See, e.g., Locantore*, 775 F. Supp. 2d at 685. "[W]here the viability of
the plaintiff's claim depends on his conviction being invalidated, the statute of
limitations begins to run upon the invalidation, not the time of the alleged
government misconduct." *Amaker v. Weiner*, 179 F.3d 48, 52 (2d Cir. 1999).

[113]    *See* Def. Mem. at 22-23.

timely on October 20, 2011 and a copy sent electronically to defense counsel.[114]
The four-day delay in effectuating hand service in Albany does not merit dismissal.

### 4.    Plaintiffs State a Claim for Unlawful Imprisonment

Defendants argue that plaintiffs fail to state a claim for unlawful imprisonment because their actions were privileged under New York State law.[115] "The common law tort of false arrest is a species of false imprisonment" and "[t]he elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law."[116]  Like the question of qualified immunity, the question of privilege turns on whether defendants' actions were objectively reasonable.[117]  Because I have found that it was objectively unreasonable of defendants to continue enforcing administrative PRS without seeking resentencing for two years after *Earley*, defendants' re-incarceration of plaintiffs was not privileged.

### 5.    Abstention Is Inappropriate

---

[114]    *See Betances* Docket No. 5.

[115]    *See* Def. Mem. at 28-31.

[116]    *Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir. 1996) (quotations and citations omitted).

[117]    *See, e.g., Wu v. City of New York*, 934 F. Supp. 581, 592 (S.D.N.Y. 1996); *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 502 (N.D.N.Y. 2010); *Ahern v. City of Syracuse*, 411 F. Supp. 2d 132, 146 (N.D.N.Y. 2006).

The Court declines defendants' invitation to abstain as it appears unlikely that this litigation will in any way interfere with ongoing state court litigation.[118]

## V.   CONCLUSION

For the reasons stated above, defendants' motions to dismiss are denied.  The Clerk of the Court is ordered to close these motions [*Betances* Docket No. 17 and *Bentley* Docket No. 21].  A status conference is scheduled for February 21, 2012 at 5:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 10, 2012

---

[118]      *See* Pl. Mem. at 32-34.

41

**-Appearances-**

**For Plaintiffs in *Betances*:**

Matthew D. Brinckerhoff, Esq.
Adam R. Pulver, Esq.
Emery, Celli, Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

**For Plaintiffs in *Bentley*:**

Joel Berger, Esq.
360 Lexington Avenue, 16th Floor
New York, New York 10017
(212) 687-4911

**For Defendants:**

Michael J. Keane
James B. Cooney
Assistant Attorneys General
State of New York
120 Broadway, 24th Floor
New York, New York 10271